IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KENNETH WALLACE | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 06-4236 |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendant. | : | |

**Jones II, J.**                                                                                    **April 26, 2010**

## <u>MEMORANDUM</u>

Before the Court is Defendant City of Philadelphia's ("Defendant" or the "City") Motion for Summary Judgment (Dkt. No. 31) ("Motion"), Plaintiff Kenneth Wallace's ("Plaintiff") Opposition thereto (Dkt. No. 32) ("Pl. Opp."), and Defendant's Reply (Dkt. No. 33) ("Def. Reply").[1]  In this employment discrimination case, the City argues that a police officer's request to wear his beard beyond the length permitted by policy for religious reasons cannot be reasonably accommodated without imposing an undue burden upon the City, and that he was not retaliated against for complaining about discrimination under said policy.  The Court agrees. Upon close and careful consideration of the parties' extensive briefing and statements of fact, the Court concludes that there are no disputes of material fact that would present a genuine issue for trial, and finds that Defendant is entitled to summary judgment as a matter of law.   Accordingly, for the reasons discussed *infra*, the Court will grant the motion.

---

[1]The Court treats Defendant's submission in response to Plaintiff's Opposition as a Reply and refers to it as such, although Defendant in fact styles the submission as a "Surreply."  *See* Dkt. Nos. 33 and 36.

## I. PROCEDURAL BACKGROUND

On September 22, 2006, Plaintiff filed a Complaint against Defendant alleging that the City intentionally discriminated against him by refusing to accommodate his religious beliefs, then retaliated against him for complaining about the City's allegedly unlawful discrimination. He seeks relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Counts I and II) and the Pennsylvania Religious Freedom Protection Act, 71 P.S. § 2402, *et seq.* (Count III). Defendant filed its Answer to the Complaint on November 10, 2006. The case was placed in suspense on January 10, 2007, pending Plaintiff's receipt of a Right-to-Sue letter from the Equal Employment Opportunity Commission ("EEOC"),[2] then removed from suspense on August 11, 2008.

On September 19, 2008, Plaintiff filed an Amended Complaint, alleging religious discrimination and retaliation under Title VII (Counts I and II) as well as under the Pennsylvania Human Relations Act, 43 P.S. § 955, *et seq.* ("PHRA") (Counts III and IV). Defendant filed its Answer to the Amended Complaint on October 24, 2008. On November 13, 2008, this matter was reassigned from the calendar of the Honorable Mary A. McLaughlin to the calendar of the Honorable C. Darnell Jones II. Defendant filed this Motion on November 27, 2009; Plaintiff filed its Opposition in response on December 28, 2009 and Defendant's Reply was docketed on

---

[2]On July 21, 2005, Plaintiff filed a charge of religious discrimination with the Philadelphia Commission on Human Relations ("PHRC") and the EEOC. (Amended Complaint ("Am. Compl.") at ¶ 23; Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem."), Ex. 2, Deposition of Plaintiff ("Pl. Dep.") 30:17-21; Pl. Opp., Ex. 5, July 2005 Complaint of Discrimination.) In July 2006, Plaintiff filed a charge of religious discrimination and retaliation with the PHRC and the EEOC. (Am. Compl. ¶ 25.)

January 11, 2010.[3]

## II.  FACTUAL ALLEGATIONS

The Court recites the undisputed material facts as viewed in the light most favorable to Plaintiff.[4]

Plaintiff began working for the City's Police Department (the "Department") in December 1996 as a recruit, and graduated from the police academy in May 1997.  (Pl. Dep. 12:16-21.)  He became a practicing Muslim in 1998; in May 2003, Plaintiff submitted a memorandum to his supervisor, Lieutenant Arch, in which he indicated that he would begin to wear a beard in observance of his religious beliefs.  (Am. Compl. at ¶¶ 6-7; *see also* Def. Mem., Ex. 3, Memorandum from Plaintiff to Lt. Arch dated May 21, 2003 ("Arch Mem.").)

Beginning in 1999, the Police Department implemented Directive 78, an internal policy which set forth the Department's requirements and prohibitions for all police personnel regarding uniforms and personal appearance (Def. Mem., Ex. 4, Philadelphia Police Department Directive 78.  ("Directive 78").)  Directive 78 explicitly prohibited beards and goatees, "except when consistent with assignment." (*Id.* at 78-09.)  Plaintiff began to wear his beard without first obtaining the permission of the Police Commissioner; he was admonished and disciplined for said violations.  (Am. Compl. at ¶¶ 8-11.)

---

[3]According to the Court's Policies and Procedures, Defendant filed its Statement of Undisputed Material Facts in conjunction with its Motion.  Pursuant to Court Orders, Plaintiff subsequently filed a Statement of Disputed Materials Facts on January 25, 2010 (Dkt. No. 39) and Defendant filed a Reply to Plaintiff's Statement of Facts on February 8, 2010 (Dkt. No. 41).

[4]Where Plaintiff has claimed that a particular material fact is in genuine dispute, the Court will address such assertion in a footnote.  If the Court does not discuss a fact at all, it is because the Court has concluded that such fact is irrelevant or immaterial and thus not worthy of discussion.

At the time Plaintiff began growing his beard in or about May 2003, Directive 78 had an exemption to the restriction on facial hair for beards worn for medical purposes.  (Directive 78 at 78-09.)  Under the medical exception, the Police Department permitted personnel to grow a beard:

> for health reasons when a waiver is authorized by the Safety Office based upon the advice of the City's Medical Director that the employee has a medical condition that prevents him from shaving.  If a waiver is authorized, facial hair will be kept trimmed and neat, not to exceed 1/4" in length.  Individuals granted a waiver shall be monitored and reviewed by the medical director every three months to determine if the medical condition persists to warrant the continuation of the waiver.

(Directive 78 at 78-09 to 78-10.)  In his memorandum to Lieutenant Arch, Plaintiff noted that the Circuit Court of Appeals had recently ruled in favor of Muslim police officers' right to wear beards for religious reasons.  (Arch Mem.)  Plaintiff emphasized that Islam:

> dictates that all Muslims are easily identifiable by having a well-maintained and distinguishing appearance.  These things not only make it easier for one Muslim to identify another, but also assures that Muslims maintain a certain reputation.  One of the ways that Muslims can achieve this is by keeping a facial beard.

(*Id.*)

Lieutenant Arch passed Plaintiff's memorandum up the chain of command to then Police Commissioner Sylvester Johnson.  (Pl. Dep. 47:05-10.)  Commissioner Johnson then consulted the City of Philadelphia's Law Department, which directed him as to the appropriate response to Plaintiff's memorandum.  (Def. Mem., Ex. 6, Deposition of Commissioner Johnson ("Johnson Dep.") 13:02-17.)  On August 14, 2003, Directive 78 was modified to permit a religious exception for beards.[5]  (Def. Mem., Ex. 5, Change to Directive 78.)  The religious exception set

---

[5]Plaintiff appears to refer to the amended Directive 78 as Directive 97; Defendant notes this misidentification.  (Pl. Statement of Undisputed Material Facts ("SUMF") ¶¶ 72-73, 77-79, 84; Def. Reply to Pl. SUMF ¶¶ 77-78.).  In citing to "Directive 97," however, Plaintiff submits

forth requirements similar to the medical exception:

> A beard may be worn when a waiver is authorized by the Police Commissioner.  A waiver will only be authorized upon a showing from the employee by his religious leader that the employee practices a religion that requires him to wear a beard.  The request for a waiver must have the name of the religion and the specific beard requirement and must be on the religious institution's letterhead.  The documentation must be notarized or subject to verification.  If a waiver is authorized, facial hair will be kept trimmed and neat, not to exceed 1/4" in length.  Waivers expire after 12 months and employees must reapply at the end of each term.

(Directive 78 at 78-10.)

According to Commissioner Johnson, the Department modified Directive 78 to include the religious exception in light of the Third Circuit decision mentioned in Plaintiff's memorandum to Lieutenant Arch, which mandated that a municipality which had an exemption to its grooming requirements for medical conditions could not refuse to make the identical exception as a religious accommodation.  (Def. Mem., Ex. 6, Deposition of Commissioner Johnson ("Johnson Dep.") 11:09-17 (referencing *FOP Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 366-67 (3d Cir. 1999)).[6]  Commissioner Johnson stated that the religious exception pertained to all religions and was not created exclusively for Muslims, although at the time only Muslim officers were requesting such waivers.  (Johnson Dep. 20:01-15.)  Subsequent to the implementation of this religious exception to the beard prohibition, Plaintiff sought a

what is clearly marked as "Directive 78;" as such, the Court assumes that the amended Directive 78 and Directive 97 are the same document and will refer to said document as "Directive 78." (Pl. Opp, Ex. 7, Directive 97 [sic].)

[6]In *City of Newark*, while not a Title VII case as here, the Third Circuit reasoned that, because the Police Department was already required by the Americans with Disabilities Act to accommodate short beards worn by officers with a qualifying medical condition, it could not refuse an identical accommodation if requested for religious reasons.  *See City of Newark*, 170 F.3d at 366-67.

waiver for the purpose of wearing a beard in observance of his religion.[7]

According to Plaintiff, "[t]he importance of the beard in Islam is a few reasons.  The number one reason is that it was a command by the Prophet Mohammad to grow the beard and to trim the mustache and to be different and to be easily recognized by your brethren that's in your religion."  (Pl. Dep. 20:18-24.)  Plaintiff also asserts that "the requirement [of his religion] is basically for you to not cut your beard if you can grow your beard."  (*Id.* at 23:13-15.)  Plaintiff admits, however, that he "know[s] a lot of Muslims that don't have beards," and that not all of those Muslims were physically unable to grow a beard.  (*Id.* at 25:06-12.)

Commissioner Johnson, for his part, testified that Directive 78 and its religious accommodation provision were designed to create uniformity and neutrality before the public:

> If a person has a quarter-of-an-inch beard, by looking at him, you couldn't tell whether he's going to be a Muslim or he's going to be this or he has a condition.  It doesn't indicate anything that has to do with religion...being a private military organization, there's rules and regulation [sic] that we have that people have to follow...I mean, it's the same as a person that comes and wants to wear a yellow shirt.  It doesn't matter what they want to wear.  These are our rules and regulations.  Here's the rules and regulations you have to follow based on our policy.

---

[7]Defendant contends that in so doing, "Plaintiff essentially conceded that he would adhere to the department's policy and maintain his beard within a quarter-of-an-inch." (Def. SUMF at ¶ 15.)  In support of this assertion, Defendant cites the "Waiver Documents of Plaintiff" (Def. Mem., Ex. 7) and Plaintiff's deposition testimony (Pl. Dep. 115:17-116:06).  However, these "Waiver Documents" consist of documents signed by Plaintiff and Plaintiff's imam, attesting to the requirement that Muslim men not shave their beards.  (Def. Mem., Ex. 7, Letter from Imam Isa Abdulmateen dated February 21, 2006 ("Imam Letter") and Waiver Request dated September 1, 2003 ("Waiver Request").)  Indeed, Plaintiff's imam's letter (submitted subsequent to Plaintiff's termination) notes that "[t]he Muslim man is required by Islamic law to allow his beard to grown *to its natural fullness*" (emphasis added).  (Imam Letter.)  Furthermore, far from conceding that he would follow the Department's policy, Plaintiff's cited deposition testimony states that he "never agreed with the quarter of an inch thing." (Pl. Dep. 115:18-19.)  Plaintiff also complained about the quarter-inch limitation to Commissioner Johnson in summer or fall 2003.  (*Id.* 54:04-55:15.)

(Johnson Dep. 21:14-19, 22:1-10.)

Between May 2003 and April 2004, Plaintiff was disciplined on multiple occasions. (Def. Mem., Ex. 8, Formal Disciplinary Papers, Performance Reports and Counseling Memoranda of Plaintiff from May 20, 2003 through April 10, 2004 ("Pl. Disciplinary Papers").) Prior to the addition of the religious accommodation to Directive 78 in August 2003, Plaintiff was counseled and disciplined regarding his failure to shave his beard.  (*Id.*)  Following implementation of the religious accommodation, Plaintiff's counseling and discipline related to his failure to trim his beard to within one quarter of an inch.  (*Id.*)[8]  On July 21, 2005, Plaintiff filed a charge of religious discrimination with the PHRC and EEOC.  (July 2005 Complaint of Discrimination.)  On January 12, 2006, Plaintiff was notified that he was being suspended for 30 days with intent to terminate his employment.  On February 9, 2006, the City terminated Plaintiff for refusing to trim his beard to a length of one-quarter of an inch.  (Def. Mem., Ex. 9, Notice of Suspension with Intention to Dismiss with Supporting Documents ("Notice of Suspension"); Johnson Dep. 53:15-21.)  Plaintiff was charged with conduct unbecoming an officer due to "[r]epeated violations of Departmental rules and regulations, as well as insubordination relating to "[r]efusal to obey proper orders from superior officer" and neglect of duty, for "[f]ailure to

---

[8]Plaintiff alleges that "[m]ore than two years after [Plaintiff's] Memorandum was submitted, in the summer of 2005, Wallace and fellow Muslim police Officer Khalid Wardlaw were summoned to the Police Commissioner's office for a meeting, where Commissioner Johnson informed Plaintiff and Wardlaw that he would permit them to wear beards in accordance with the newly amended Directive [78]."  (Pl. SUMF ¶¶ 76-77 (citing Pl. Dep. 54-55).)  However, Plaintiff testified that he and Wardlaw were called to Commissioner Johnson's office "in the fall–between the summer and fall" of 2003, because Johnson "approved [the amendment to Directive 78] back in August...[o]f '03." (Pl. Dep. 55:23-56:3.)  As such, the meeting occurred within months of Plaintiff's memorandum submission and the subsequent amendment to Directive 78–not more than two years.

comply with any Commissioner's Orders, Directives, Regulations, etc., or any oral or written orders of superiors." (Notice of Suspension.)

Plaintiff appealed his termination through his union representatives, and arbitration was held on May 21, 2009. (Def. Mem., Ex. 11, Grievance Filed by the Fraternal Order of Police, Lodge 5 on Behalf of Kenneth Wallace.)[9] At the arbitration, Captain Shaun Trush, who supervised Plaintiff in 2005, testified that on July 6, 2005, he was contacted by Captain Michael Murphy of another district, who had seen Plaintiff working at a concert with his beard in excess of one-quarter of an inch and sent him home. (Def. Mem., Ex. 12, Arbitration Testimony of Captain Shawn Trush ("Trush Test.") 06:07-14.) Captain Trush testified that he called Plaintiff to his office on July 7, 2007, inspected Plaintiff's beard, and informed Plaintiff that he was not in compliance with Directive 78. (*Id.* at 07:05-09.) Captain Trush further testified that Plaintiff informed him that Plaintiff "was aware of that [non-compliance], and that he had religious reasons for having his beard in that shape." (*Id.* at 07:20-22.)

Captain Trush testified that during this meeting, he reviewed Directive 78 with Plaintiff, "took a pen and a ruler, and showed him what a quarter inch was, and I had to hold it up against his beard to show that it was too long." (*Id.* at 08:01-06.) On two or three occasions in July 2005, Captain Trush sent Plaintiff to the Philadelphia Police Department Identification Unit ("Identification Unit") to have photographs taken so as to document the physical evidence of Plaintiff's violation of Directive 78. (*Id.* at 08:11-09:08; Def. Mem., Ex. 13, Photographs of

---

[9]On January 19, 2010, subsequent to the filing of Defendant's summary judgment motion, Arbitrator Charles D. Long issued a decision in favor of the Defendant, holding that the Police Department had just cause to terminate Plaintiff for violating Directive 78 as well as other violations of the Department's code of conduct. (Def. Reply to Pl. SUMF, Ex. 1, Wallace Grievance Award.)

Plaintiff taken July 7 and July 13, 2005 ("Photographs").)  Captain Trush testified at the arbitration that Plaintiff never argued that he was in compliance with Directive 78, but rather "that's what he wanted to do, and he was aware of the ramifications of his actions."  (*Id.* at 9:22-23.)  Captain Trush further testified that he explained to Plaintiff that Plaintiff "would be suspended and may lose his job, and [Captain Trush] was concerned for his family, and for the department, because...we have a lot of money invested in him as a police officer, but he had to comply, and he said he had his religious reasons for not complying."  (*Id.* at 10:03-08.)  Captain Trush directly ordered Plaintiff to trim his beard to comply with Directive 78, but Plaintiff never did.  (*Id.* at 10:09-10:11; Notice of Suspension.)  On or around July 28, 2005, Captain Trush stated that due to Plaintiff's failure to comply, he was compelled to fill out disciplinary paperwork.  (Trush Test. 10:11-11:03.)

Shortly thereafter, Plaintiff underwent an unrelated medical procedure and was subsequently transferred to the Differential Police Unit, an assignment for officers unable to work in the normal line of duty due to injuries or other circumstances.  (Pl. Dep. 89:16-90:13.) Sergeant James Ferguson testified at the May 2009 arbitration that while supervising Plaintiff in 2005, on several occasions he and his supervisor, Lieutenant Zimmerman, counseled Plaintiff on his beard's excessive length.  (Def. Mem., Ex. 14, Arbitration Testimony of James Ferguson ("Ferguson Test.") 05:13–06:11.)  On two occasions, Sergeant Ferguson transported Plaintiff to the Identification Unit to take photographs of Plaintiff's beard to document Plaintiff's noncompliance.  (*Id.* 06:11-20; Photographs.)  Sergeant Ferguson also testified that following the July 7th concert incident, which resulted in Plaintiff being sent home, Plaintiff called in to the Department to inquire when he would be allowed to return to work.  (Ferguson Test. 08:07-

08:10.)  When Plaintiff called, Sergeant Ferguson asked Plaintiff whether or not he was in

compliance; on each occasion, Plaintiff replied that he was not, and Sergeant Ferguson instructed

Plaintiff that he would not be able to return to work as a result.  (*Id.* 08:10-12.)

In 2006, Sergeant Ferguson marked Plaintiff as "unsatisfactory" in several categories for

the prior calendar year.  (*Id.* 07:09-08:01; Def. Mem., Ex. 15, February 2006 Performance Report

of Plaintiff as Evaluated by Sergeant Ferguson for Employment Year 2005.)  He explained that

the underlying reason for the unsatisfactory ratings was Plaintiff's repeated violation of

departmental policies and his refusal to comply with direct orders of his supervisors.  (Ferguson

Test. 07:09-08:01.)  Sergeant Ferguson testified that based on his 13 years of experience on the

Police force, he had amassed the skills and experience to determine physical characteristics of an

individual and to be able to ascertain measurements such as height, length and distance, and to

determine that Plaintiff was not in compliance with Directive 78.  (*Id.* At 10:12-11:21.)

Inspector Cynthia Dorsey, currently assigned to the Office of Professional Responsibility,

also testified at the arbitration.  She stated that on September 19, 2005, she arrived at work at the

Command Inspection Bureau and was requested to report to the DPR[10] unit to inspect an officer

for compliance with Directive 78's beard provision.  (Def. Mem., Ex. 16, Arbitration Testimony

of Inspector Cynthia Dorsey 04:24, 05:10-24.)  Inspector Dorsey had never met Plaintiff before,

but based upon a visual inspection, she determined that Plaintiff was in violation of Directive 78.

(*Id.* 06:02-09.)

Specifically, Inspector Dorsey testified that it was clear that Plaintiff attempted to "pat it

---

[10]Neither Inspector Dorsey's deposition testimony nor the parties' briefs define "DPR," although the Court may surmise that the DPR unit is the same entity as the Differential Police Unit.  *See supra* at 9.

down in order to make it appear less full, but it was so full and so thick that I didn't see any skin underneath the beard;" Inspector Dorsey said to herself "that you could hide like a dwarf in the beard or something." (*Id.* 06:19-23.)  Like Sergeant Ferguson, Inspector Dorsey testified that her 25 years with the Department provided her with the training and experience to determine physical characteristics of a person as well as empirical measurements such as height, length, distance and size, and that she was able to visually affirm that Plaintiff's beard was in excess of one-quarter of an inch. (*Id.* 07:11-08:13.)  Inspector Dorsey testified that when she informed Plaintiff that he was not in compliance with the Directive, he responded that "he knew he wasn't in compliance, but he had an opinion that he should be allowed to wear the beard, you know, conforming to his religious beliefs." (*Id.* 09:04-06.)  She instructed him to comply with Directive 78 and documented her discussion with Plaintiff.  (*Id.*; Notice of Suspension.)  As discussed above, the City ultimately terminated Plaintiff on February 9, 2006 for refusing to trim his beard to a length of one quarter of an inch as required by Directive 78.  (Notice of Suspension.)[11]

## III.  LEGAL STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to a material fact and that the moving party is entitled

---

[11]Plaintiff alleges a number of instances where Plaintiff was disciplined or otherwise treated differently from other Police Department employees because he was Muslim.  (Pl. SUMF ¶¶ 57, 59, 61, 85-87.)  However, such facts would be relevant and material only if Plaintiff asserted a "disparate treatment" theory of religious discrimination.  As Plaintiff has clearly pursued only a "failure to accommodate" theory of religious discrimination in this matter, the Court finds these additional facts irrelevant and immaterial to Plaintiff's claims in this case, and as such omits their recitation herein.  (Pl. Opp. at III.B.)

to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

Fed. R. Civ. P. 56(c).  In order to defeat a motion for summary judgment, disputes must be both

(1) material, meaning concerning facts that will affect the outcome of the issue under substantive

law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a

verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is mandated "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322-23.  An issue is genuine if the fact

finder could reasonably return a verdict in favor of the non-moving party with respect to that

issue.  *Anderson*, 477 U.S. at 248.  In reviewing a motion for summary judgment, the court "does

not make credibility determinations and must view facts and inferences in the light most

favorable to the party opposing the motion."  *Seigel Transfer, Inc. v. Carrier Express, Inc.*, 54

F.3d 1125, 1127 (3d Cir. 1995).

## IV.  DISCUSSION

### A.      Religious Discrimination

In Counts I and III of his Amended Complaint, Plaintiff asserts that Defendant unlawfully

discriminated against him on the basis of his religion under Title VII and the PHRA by failing to

accommodate his religious beliefs, then disciplining and terminating him because he refused to

trim his beard in compliance with Directive 78.  Title VII prohibits employers from

discriminating against an individual in hiring, discharge, compensation, term, conditions, or

privileges of employment on the basis of his or her religion. *See* 29 U.S.C. § 2000e-2(a)(1).[12]  In

the Third Circuit, employees may rely on two different theories to establish a claim for religious

discrimination: "disparate treatment" on account of religion, or "failure to accommodate"

religious beliefs.  *Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 281 (3d Cir.

2001).[13]  Where, as here,[14] a plaintiff brings his claims under a failure-to-accommodate theory, he

must first establish a *prima facie* case of religious discrimination by establishing that: "(1) he

holds a sincere religious belief that conflicts with a job requirement; (2) he informed his

employer of the conflict; and (3) he was disciplined for failing to comply with the conflicting

requirement."  *Webb v. City of Phila.*, 562 F.3d 256, 259 (3d Cir. 2009) (citing *Shelton v. Univ.

of Med. and Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000).

     Once the employee establishes these factors, the burden shifts to the employer to show

either it made a good-faith effort to reasonably accommodate the religious belief, or that such an

accommodation would result in undue hardship upon the employer and its business.  *Id.*  An

---

[12] Discrimination and retaliation claims under Title VII and the PHRA are analyzed in the same manner.  *See Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (discussing the similarity of Title VII and PHRA retaliation analysis); *Weston v. Pennsylvania*, 251 F.3d 420, 425 n.3 (3d Cir. 2001) (same).

[13] Plaintiff cites *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004), in support of his contention that "a Title VII religious discrimination claim may be brought under several theories, including disparate treatment on account of religion, failure to accommodate religious beliefs or workplace harassment based on religion."  However, the out-of-Circuit *Peterson* states only that "[a] claim for religious discrimination under Title VII can be asserted under several different theories, including disparate treatment and failure to accommodate."  *Id.* at 603.  Here Plaintiff clearly pursues his claim under the failure-to-accommodate rubric.

[14] Indeed, Plaintiff subtitles his argument in support of his religious discrimination claim as "The City Intentionally Discriminated Against Wallace by Refusing to Accommodate his Religious Observance."  Pl. Opp. at 10.

accommodation "constitutes an 'undue hardship' if it would impose more than a *de minimis* cost

on the employer," and both economic and non-economic costs may constitute such undue

hardship. *Id.* at 259-60 (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 83-84

(1977)). While each case must be examined closely in context, precedent "strongly suggests that

the undue hardship test is not a difficult threshold to pass." *Id.*

Plaintiff alleges that the City failed to accommodate his religious beliefs by allowing him

to wear his beard in excess of one-quarter of an inch in length, as called for by his Muslim faith

but in violation of Department policy. Defendant appears not to dispute that Plaintiff has made

out a *prima facie* case of religious discrimination, and the Court agrees. With regard to the first

element, Plaintiff demonstrated his *bona fide* religious belief that he grow a beard beyond one-

quarter of an inch in observance of his Muslim faith, which conflicted with Directive 78. With

regard to the second element, Plaintiff clearly informed the Police Department that he intended to

grow his beard longer than a quarter-inch; the Department chose not to modify Directive 78 to

accommodate such greater length. Finally, with regard to the third element, Defendant agrees

that Plaintiff was disciplined and ultimately terminated for failure to comply with Directive 78.

As such, the burden shifts to the City to demonstrate that it made a good-faith effort to

reasonably accommodate Plaintiff's religious belief, or that such an accommodation would

impose undue hardship upon it. Here the City has shown that it did attempt to accommodate

Plaintiff's Muslim faith and that further accommodation was not feasible without forfeiting key

Department goals. Following Plaintiff's memorandum to Lieutenant Arch regarding his intent to

grow his beard in accordance with his faith, despite the Department's lack of a religious

exception to its beard prohibition at that time, Commissioner Johnson amended Directive 78 to

allow Department employees to wear beards in observance of their religious beliefs consistent

with the previously established medical exception.  However, to require the Department to allow

employees to grow beards beyond one-quarter inch would indeed impose the undue hardship of

sacrificing the Department's commitment to a neutral appearances policy.

Commissioner Johnson testified that his goal in implementing the religious

accommodation provision to Directive 78 was to satisfy the legal precedent set by *FOP Newark*

*Lodge.*  In that case, as discussed further in *Webb*, the Third Circuit held that "the government

cannot discriminate between conduct that is secularly motivated and similar conduct that is

religiously motivated. [...] [T]he police department must create a religious exemption to its 'no-

beards' policy to parallel its secular one, unless it could make a substantial showing as to the

hypothetical negative effects of a religious exemption."  *Webb*, 562 F.3d at 260.  The Department

had determined that a medical exception allowing beards up to a quarter-inch would not unduly

harm police interests; it could not find otherwise in light of the religious exception for the same

quarter-inch.  Indeed, Commissioner Johnson was clear that in attempting to accommodate

Plaintiff, he sought to eliminate any such distinction, such that an observer would not be able to

tell whether a bearded employee had invoked a medical or religious exception to the general

prohibition on facial hair.

The City has not asserted an undue hardship in accommodating the religious exception

where it already chose to accommodate a medical exception.  It has embraced precisely the same

accommodation in both instances.  Plaintiff contends that this quarter-inch limitation successfully

accommodates certain medical conditions, but that it does not comply with his genuinely held

belief that he is entitled to grow his beard as long as possible.  (Pl. Opp. at 14.)  If Directive 78

aims to render indistinguishable beard-wearers of Muslim faith from beard-wearers suffering from a medical condition, Plaintiff argues, then "'we have before us a policy the very purpose of which is to suppress manifestations of the religious diversity that the First Amendment safeguards.'" (Pl. Opp. (citing *FOP Newark Lodge*, 170 F.3d at 367).)  But here the Police Department has not provided one type of exemption while refusing another based on religion; the exact same exemption has been offered in both instances.

This Circuit has made very clear that to permit employees to mark themselves uniquely in the name of religious accommodation, at the cost of maintaining an employer's neutrality and uniformity, may ask too much.  In *Webb*, a female Philadelphia police officer brought claims of religious discrimination under Title VII on the basis of the Department's refusal to allow her to wear a head scarf in accordance with her Islamic faith.  The Third Circuit found that Commissioner Johnson's consistently articulated reason for refusing to accommodate Ms. Webb by allowing her to wear a head scarf–the need to maintain neutrality and uniformity in the Department–was "sufficient to meet the more than *de minimus* cost of an undue burden."  *Webb*, 562 F.3d at 262 (citing *Hardison,* 432 U.S. at 84).

Certainly, in *Webb* no officer was permitted to wear a head scarf for medical reasons but denied that permission for religious purposes.  But here, the Department did accommodate Plaintiff such that he was allowed to grow a beard in the same manner as an individual with a medical exemption.  This policy preserved the Department's emphasis on presenting a united front while respecting the religious needs of its employees.  Indeed, in the *Webb* court's words, "what is at stake is the Philadelphia Police Department's perception of its impartiality by citizens of all races and religions whom the police are charged to serve and protect.  If not for the strict

16

enforcement of Directive 78, the essential values of impartiality, religious neutrality, uniformity and the subordination of personal preference would be severely damaged to the detriment of the police department." *Id.* at 259.  The Supreme Court, too, has recognized the importance of these goals.  *See Kelly v. Johnson*, 425 U.S. 238, 241 (1975) ("A police department's choice of organization, dress and equipment for law enforcement personnel is a decision entitled to the same sort of presumption of validity as are state choices designed to promote other aims within the cognizance of the state's police power."); *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) ("the traditional outfitting of personnel in standardized uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission").

Here the Department attempted to reasonably accommodate Plaintiff's request by amending its prohibition against beards in order to allow for a religious as well as medical exemption.  Plaintiff has failed to demonstrate that his additional request to wear his beard at any length would not create a *de minimis* hardship for the Department, and as such his religious discrimination claim fails under Title VII and the PHRA as a matter of law.

**B.    Retaliation**

In Counts II and IV of the Amended Complaint, Plaintiff also claims Defendant unlawfully retaliated against him in violation of Title VII and the PHRA.  To establish a *prima facie* case of retaliation under Title VII, Plaintiff must show that: (1) he engaged in protected activity; (ii) his employer took adverse action against him; and (3) a causal link exists between the protected activity and his employer's adverse action.  *See Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001); *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 1777 (3d Cir. 1997).

Defendant claims that Plaintiff fails even to establish a *prima facie* case of retaliation because his Amended Complaint contains no allegations of protected activity under Title VII for which he was unlawfully disciplined, nor any causal link between his engaging in said activity and any adverse action taken against him.[15]  At most, according to the City, Plaintiff's deposition testimony explains that the basis for his retaliation claim "would be...them firing me and also constantly writing me up based upon me just wanting to observe my religious practice and wear a beard." (Pl. Dep. at 128:12-25.)  Defendant maintains that only complained-of conduct may constitute protected activity, and that Plaintiff's July 2006 EEOC charge of discrimination could not have prompted Defendant's retaliation because Plaintiff had already been terminated in February 2006.  (Def. Mem. at 22.)

Plaintiff, however, contends that the protected activity triggering Defendant's retaliation was the filing of his *July 2005* EEOC charge.  *See supra*, n.2; Pl. Opp. at 17.  According to Plaintiff, he filed his charge of religious discrimination on July 21, 2005 and five months later, in December 2005, Captain Trush requested disciplinary action against him.  This request then resulted in Plaintiff's termination on February 9, 2006.  As such, Plaintiff argues, the temporal proximity between the filing of July 2005 EEOC charge and Plaintiff's termination raises an inference of causal connection between the two events.  *See* Pl. Opp. at 17 (citing *Kachmar*, 109 F.3d at 177).

Defendant responds that only now, in opposition to Defendant's summary judgment motion, does Plaintiff raise the allegation that he was retaliated against for filing the July 2005

---

[15]Defendant concedes that Plaintiff has satisfied the second prong of the *prima facie* test; Plaintiff was indeed disciplined and ultimately terminated for violating Directive 78. *(*Def. Mem. at 21.)

discrimination charge.  (Def. Reply at 2.)  Defendant argues that neither the Amended Complaint

nor Plaintiff's deposition articulate any such theory of retaliation.  (*Id.* at 2-3.)[16]  The Court notes,

however, that the Amended Complaint states the following in three consecutive paragraphs:

> 23.  On or about July 21, 2005, plaintiff filed a complaint of religious discrimination with the Philadelphia Commission on Human Relations and United States Equal Employment Opportunity Commission.
>
> 24.  On or about January 12, 2006, plaintiff was notified that, because of his alleged failure to trim his beard, he was being suspended for 30 days with the intent to terminate his employment.
>
> 25.  On February 12, 2006, the City terminated plaintiff's employment, claiming that he had committed misconduct for failing to trim his beard in accordance with defendant's policy.

Am. Compl. ¶¶ 23-25.

The City contends that even if the Court were to entertain this allegedly new theory of

retaliation at this juncture, such theory fails on the underlying facts.  Plaintiff claims in his

opposition to the Motion that after his July 2005 charge, which related to religious discrimination

stemming from his discipline for growing his beard in violation of Department policy, Captain

Trush requested disciplinary action against him in December 2005, which ultimately led to his

February 2006 termination.  In support of this claim, Plaintiff cites Captain Trush's Request for

Disciplinary Action, issued on December 15, 2005.  (Pl. Opp., Ex. 8, Request for Disciplinary

Action, dated February 15, 2005.)  This Request resulted from Plaintiff's December 9, 2005

refusal to sign a disciplinary report regarding his violation of Directive 78.  (*Id.*)  In Defendant's

---

[16]Plaintiff's testimony that his retaliation claim was based upon "them firing me and also them constantly writing me up based upon me just wanting to observe my religious practice and wear a beard" alludes to his being terminated as a result of his growing his beard in violation of Directive 78, not being disciplined and then terminated for filing a discrimination charge.  (Pl. Dep. at 128:12-25.)

casting, this insubordination was the basis for Captain Trush's request for disciplinary action in December, not Plaintiff's filing of his July 2005 discrimination charge.  Similarly, Defendant argues that Plaintiff's Notice of Discharge makes no reference to Captain Trush's December 9, 2005 Request for Disciplinary Action, and thus Plaintiff's termination could not have been predicated upon that Request as alleged by Plaintiff.  (Def. Reply at 3.)

The Court declines to endorse Defendant's interpretation of these facts.  While perhaps not as explicit as Plaintiff makes it out to be, the record tells us that: (1) Plaintiff filed a discrimination charge in July 2005; (2) on December 9, 2005, Plaintiff was issued a disciplinary action regarding his failure to trim his beard; (3) on December 15, 2005, Captain Trush requested disciplinary action against Plaintiff for his failure to sign the December 9 disciplinary action; (4) Plaintiff's Notice of Intention to Dismiss, issued January 12, 2006, stated that Plaintiff was to be dismissed for "violations of Departmental rules and regulations," "refusal to obey proper orders from superior officer," and "failure to comply with...Orders, Directives, Regulations, etc.;" (Pl. Disciplinary;  and (5) Plaintiff ultimately was terminated on February 12, 2006 for those same reasons.

Plaintiff's retaliation claim turns, then, on whether a causal link indeed exists between Plaintiff's discrimination charge and his termination.  As both parties acknowledge, temporal proximity between an employee's protected activity and an employer's adverse action may establish proof of such causation.  *See Kachmar*, 109 F.3d at 177.  Plaintiff attempts to convince the Court that an interlude of five and seven months between Plaintiff's July 2005 discrimination charge and the December 2005 disciplinary action and February 2006 termination, respectively, is brief enough to raise the inference that Plaintiff's discrimination charge was the likely reason

for his discipline and termination.  (Pl. Opp. at 17.)  However, he cites no caselaw in support of this proposition, and indeed, the Court remains unpersuaded.

While timing alone may be sufficient to raise an inference of retaliatory animus, it must be "very close."  *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing *O'Neal v. Ferguson Constr. Co.*, 237 F.ed 1248, 1253 (10th Cir. 2001); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992) (4-month period insufficient)).  A five- or seven-month period between Plaintiff's filed charge and his termination is insufficient on its own to establish an inference of retaliatory animus.  No causal link can be inferred from such a lapse of time alone.

Absent temporal proximity, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference."  *Kachmar*, 109 F.3d at 177.  Plaintiff again fails to point the Court to evidence or caselaw to support his argument that he was "subjected to hostility and antagonism from the date he began to grown his beard until he was ultimately terminated."  However, the Court recognizes the following timeline:

Plaintiff began to grow his beard in May 2003, when the Department prohibited beards without medical exemptions.  Plaintiff was subsequently disciplined for violation of that policy (Directive 78).  In August 2003, the Department revised its policy to allow beards up to 1/4" long under a religious exemption.  Plaintiff grew his beard beyond 1/4" and thus was disciplined several times between August 2003 and July 2005.  In July 2005, more than two years after he began to grow his beard, Plaintiff filed his first discrimination charge.  In December 2005, Captain Trush requested disciplinary action against Plaintiff.  In January 2006, Plaintiff was

21

informed that he would be terminated in February 2006 for continued violation of Department

policies, which he was.

Crucially, Plaintiff fails to explain to the Court how this consistent discipline based on

Plaintiff's violation of Department policy is tantamount to a "pattern of antagonism."  Plaintiff

does not allege any antagonism escalated after he filed his July 2005 EEOC charge; indeed,

Plaintiff points out that he was disciplined for growing his beard prior to Directive 78's

amendment, and he was disciplined after said amendment for failure to trim his beard to one-

quarter of an inch; his discipline did not ramp up.  *See Valdes v. Union City Bd. of Educ.*, 186

Fed. App'x 319, 324 (3d Cir. 2006) (finding no pattern of antagonism where employee was

terminated based on continuing misconduct occurring before and after EEOC complaint was

filed); *McCullers v. Chertoff*, Civil Action No. 07-4187, 2010 WL 99378, at *10 (E.D. Pa. Jan.

11, 2010); *cf. Robinson v. SEPTA*, 982 F.2d 892, 895-96 (3d Cir. 1993) (finding pattern of

antagonism due to barrage of warnings and disciplinary actions after plaintiff's initial

complaints).  No reasonable finder of fact could conclude that Plaintiff was disciplined in

December 2005 and terminated in February 2006 for any reason other than his continued refusal

to comply with the revised Directive 78 and maintain his beard at one-quarter of an inch in

length.

## V.  Conclusion

For the reasons stated herein, Defendant's Motion for Summary Judgment shall be

granted.  Judgment shall be entered in favor of Defendant and against Plaintiff.  This matter shall

be closed.